Thank you, Judge Smith. Your Honors, if it pleases the Court, I'm Jeff Buscella. I'm the attorney for the appellant Ghermon Tucker. I'd like to reserve eight minutes of rebuttal time this morning. Your Honor, this case, a reverse sting, in general presents the disturbing phenomenon of these prosecutions which have become more and more prevalent throughout the country. And these are prosecutions which, pursuant to which, the government can, as it did in this case, produce a significant amount of stated or alleged evidence, directly or indirectly, against the defendant. But this is evidence that the appellant could not directly confront during the trial of his case. And I think many of the issues that appellant has raised dovetail with each other. Much of the case against appellant depends on what took place during this February 4th meeting between the alleged co-conspirators in this reverse cocaine stealing sting case. The problem with that particular meeting is multifold. Basically, much of the evidence was based upon a meeting which took place over approximately 33 minutes. And the statements that were made by everybody else present at that meeting take up virtually all of that conversation. Counsel, just so we're on the same page here, correct me if I'm wrong. We're talking about an incident that was videoed, right? I mean, we're not guessing what happened. The video shows what happened. Is that correct? Well, I think I would differ with that. I mean, there's certainly photographic evidence that the alleged participants in this conspiracy were together, were seen together. There's evidence that they were traveling together. Certainly at the time that the two vehicles were stopped, one of the vehicles my client was in, there's no question that there was incriminating evidence found in those vehicles. And you could see that the gun was placed to the head, etc., etc., right? Pardon me? You could see that the gun was placed to the head and so on? No, I'm not aware of any evidence with respect to that at all. Okay. In this case, Your Honor, just to remind the Court briefly of what the facts are, basically an undercover agent, highly paid by the federal government, who had been working as an informant for a considerable period of time, about 15 years, was asked basically to try to set up this reverse sting. In the course of doing that, he made various contacts in the Phoenix area and Arizona. Eventually this culminated in a meeting on February 4th, 2011 or 2012, I forget which year at this point. At that meeting, there were five or six individuals. One of those individuals was my client. Now, to answer your question, Judge Smith. Counsel. Yes. So you concede that your client was at the February 4th meeting? I'm not conceding that he was there. The government, of course, has taken that position all along. That's what you just said, so I'm a little startled that you said that. Well, I'm sorry. I misspoke. Many of the arguments flow from this February 4th meeting where my clients consistently said that he was not at that meeting. So your position is what now? You said initially that he was there. You're telling Mr. Watford he wasn't. He was not at the meeting, but I recognize that this Court's decision on some of the legal issues raised in the brief may arise out of the Court's assumption that he was at the meeting. But if he wasn't at the meeting, then obviously there is nothing that ties him to the conspiracy, other than the fact that he was in the company of these other people. Is there any evidence that was presented to the jury that could have permitted the jurors to conclude that your client was there? At the February 4th meeting. Correct. The evidence was the confidential informant claimed that he could identify my client as having been present at that meeting, and that's an issue that's raised in the suggestive identification. That's just a question of weighing the credibility of that informant, right? Well, one of the issues is the suggestiveness of the identification procedure. But that all went to the jury, right? Pardon me? That all went to the jury. It did go to the jury. He had an opportunity through competent counsel to argue that to the jury. But the jury makes determination on the facts. Is there anything in this record that would cause us to disturb that factual finding by the jury that your client was there and was guilty? Could you restate the question, Judge Wallace? Sure. Is there anything in the record that would cause us to set aside the jury factual determination that your client was there and was involved? Well, I think other than the issues that we've raised with respect to the ---- We give substantial deference. I'll have to admit I have problems with this case. I don't for the life of me understand how they came out charging your client and letting others walk when they're all sitting in the same car, and there were the telephone record from your client to the driver and the driver's walking. I don't understand how the jury made this determination, and we will never know. But from an appellate level under our system, if there are sufficient facts for a reasonable jury to make the determination if the facts are there that your client is guilty, there's not much we can do with this unless you can show something that will cause us to say the jury verdict on the factual issue has to be set aside. So that's where I'm troubled with the case. That's where I think your burden is. Right. Well, depending on the standard of review on some of these issues, but it seems to me that to try to answer that question, you have some key evidentiary issues. I mean, the jury does not have this evidence, for example, unless it's relying on the so-called transcript of the February 4th meeting. Okay. And that's a transcript that, of course, we have a great deal of problem with. We've criticized it. It's been raised in two or three separate issues here. The fact that the jury, and to get back to your question on why the jury made the decision that it made, in my view, the jury made that decision because they were in doubt about whether or not there was sufficient evidence that he was guilty. They were allowed to listen to the playback of the February 4th recorded meeting without a cautionary instruction. Was one asked for? Pardon me? Was a cautionary instruction asked for? You know, I can't tell the Court right this second. I don't recall. I didn't find that it was requested. Right. Pretty hard to tell the judge that he was wrong when it wasn't asked for. Well, I think the case law that we've cited indicates that the judge has a suspente duty to instruct and that it's error not to instruct. In fact, if I recall correctly, I think it's the Newhoff case, where this Court basically said that it was per se plain error for a judge to send back into the deliberations room an exhibit or a recording like this without giving a cautionary instruction. And I think that was the precise wording of the Newhoff opinion. Under that case, do we apply a harmless error standard, or are you claiming this is structural error? Well, I don't think I can claim that it's structural error. So we apply harmless error and look at the totality, basically, of the evidence and whether your client received a fair trial? Well, yes, but I think then you have to scrutinize the other evidence and whether it was lawfully admitted. Oh, I agree. But I'm just saying on that one issue, that's what we're dealing with, right? Can I ask this? What is the problem, in your view, with the partial transcript? Let's say that it did go into the jury room. Is it just that, as I understand it, it's just the portion of the meeting at which your client was present that they asked for the plain of the tape back, right? I'm not sure the record is entirely clear on that, but my belief is that they were listening. Just to the 11, 12 minutes where your client was allegedly present, right? You know, I want to say that they may have listened to the entire recorded conversation, but that they also listened to a restricted portion of the recording, which included, would have had to have included, in my view, would have had to have included an accompanying transcript, and I forget what it was referred to in the record, but there was a mechanism where they played the recording, and if I understand correctly, the translation into English was put up on the monitor simultaneously. That's during trial. I thought we were talking about the playback. Well, and I think, you know, I don't know, but the judge brought the jury into the courtroom for the playback. And my thinking, and of course this is just drawing an inference. Nobody was there. Well, we don't have a record. I asked for a transcript of that particular day of trial, and I got a transcript that covered a couple of other jury questions, and there was no record that I'm aware of as to what happened with the playback. So we don't know one way or another. Well, but the only reasonable inference is, you know, we don't have any information that this was a Spanish-speaking jury. So what would be the point of listening to the recording if they didn't have a translation? That's what I guess I'm trying to figure out. Obviously they were interested in the portion of the meeting at which your client allegedly said something. He only said a few words. Right. In English, I assume. So they wanted, I guess, they wanted to hear that. None of the other people was on trial who was at that meeting. So I don't see the harm, even if they were played just a couple of minutes during which your client had some kind of conversation, I don't see what the harm is. Why would they want to listen to the whole 30 minutes of people speaking in Spanish? It's totally irrelevant in some sense to your client's case, right? So what's the harm from your standpoint from even, let's assume the worst, that they asked for and had the playback of only a very limited portion of the meeting at which your client actually spoke? What's the prejudice that could arise from that? Well, the prejudice is if they're entertaining doubts about my client's guilt, then they're looking for something that might clinch their decision. So they're giving undue influence to this tiny, tiny, tiny portion of the record. And the disturbing thing about that is this was a record created, I mean, there's several issues on this, but this was a record where there's considerable doubt about what actually was said and what the translation was. But what is the considerable doubt that was shown to the jury? Pardon me? The only thing I recall you raising was that they weren't certified translators. I didn't see anything in the record that the translation was wrong. And, of course, certified translators doesn't help you because that statute has to do with something else. So what do we have in the record that the translation was wrong? I didn't find anything. Well, you know, I have to admit defense counsel's objections were not very exact. Yes. The objections that defense counsel made, and I can cite the court to the reporter's transcript page, but basically he, figuratively speaking, was jumping up and down saying the entire transcript is inaccurate. This is ridiculous. It's all in Spanish. It's completely inaccurate. I object to it. So it's not a very specific objection, but it has to be disturbing that the transcript, the transcript is another aspect of the testimony that Mr. Tucker would have had great difficulty confronting because it was out-of-court testimony. You know, the informant was certainly subject to being examined, but the informant was filling in all of the gaps. You want to save some time? You wanted eight minutes. We're down to five and a half minutes. And I was looking for a red button. Okay, well, there's no button. Okay. There's a trap door, but no button. If you want to save time, collect your thoughts, and we'll hear from the government, and we'll hear you come back for rebuttal. Thank you. Good morning. May it please the Court. I'm Chris Cabanillas from the District of Arizona. First, I'd ask the Court to affirm the conviction and sentences, but just getting right to the questions that the Court asked. When it comes to that Exhibit 2C, you asked what portion was played. If you take a look at Exhibit 2C, and the defendant has included the transcript in his excerpts of record pages ER 218 to 237. That transcript was provided to the jury as it listened to the tape. This is at trial. And then as Mr. Bichella correctly noted, and the Court did as well, that when the Spanish was being played, the English translation, which is in Exhibit 2C, went along with it. And we know that Exhibit from 1 to 21 was played in its entirety. We can tell also by the way that the prosecutor stops the informant every once in a while and says, hey, what do you think about this? What do you think about that? And you'll see, like, one of the last things that the prosecutor refers to talks about one of the co-conspirators mentioning something about not having papers. And that appears on page 20 of the transcript. So, you know, again, they went through the whole transcript, 1 to 21. Now, the entire conversation on 2-4 was actually 32 pages. That's in the full. But the only one paid at trial was the one from 1 to 21. The prosecutor said, hey, you know, I'm going to play from 1 to 21 or 60 percent of this. If you want us to play more, let me know. Defense counsel never asked to hear more. And the jury then heard that pages, you know, 1 to 21 of that Exhibit 2C transcript. So the jury has it when they're in trial reading along as well. And there's a reference made to how the English words in the transcript are italicized. So when you look at Exhibit 2C, the transcript, you'll see that the English translation appears of what the Spanish was. But whenever anyone spoke in English, that's italicized. And that was made clear to the jury as well. And those references are ER 104 and 111. Can I ask you about the identification that the informant made? I'd just like to hear a little bit of your response to the argument raised, not so much here but in the briefs. I guess I see some issues with that and wondered if, number one, what your response was, and then, number two, if I were sufficiently troubled by the reliability of the ID at the end of the day, such that I thought it shouldn't come in, shouldn't have come in at trial, what other evidence was there to sustain the jury's finding that the defendant was nonetheless at that meeting? Yes, Your Honor. First, I would submit that the court properly admitted that identification. The court found it was not unduly suggestive and that the informant's identification of the defendant was reliable. How could it have been any more suggestive? I mean, he was shown a single ‑‑ I mean, he was shown three pictures, I guess, of African Americans. Actually, there were 18 total, but 16 were Hispanic individuals and two were African American individuals. Okay. So even if the court finds that that was a suggestive show up, the district court found it was sufficiently reliable, and I guess I would point to a few things under Neal v. Biggers. The defendant was present at the meeting for 12 minutes, according to the record. That's at August 9, 2012, 146 and 67. He was from three to four feet away from the informant, had an opportunity then to see him, and there were only five people at that meeting. And the identification occurred within 10 days after that, so it's fairly fresh in the mind. But the informant gives a completely inaccurate description of the person who was there, right? And all of that was brought out to the jury. And I think there's actually 10 pages of cross-examination on this by the defense counsel for the defendant at August 9, 2012, pages 48 to 57. So the jury is hearing all about those sorts of things. And I think that goes to your second question about harmlessness, is that if the court was to find that the informant's identification of the defendant, if the pre-trial ruling had— Well, it's a legal—it's a due process issue as to whether it should have come in. So it's not cured by the jury hearing conflicting evidence on how accurate it was. If the judge erred by not keeping it out, that's just a legal error. Well, I would submit there's also other evidence to demonstrate that the defendant was present, including the presence of his Cadillac at the scene of the meeting. There was no other defendant whose vehicle was present there. We also had the phone calls that are made from Mako, the Mexican co-conspirator, to the defendant at critical times right before he showed up. And also, it would have been timing-wise, based on the surveillance, the government talks about that. If you look at the phone records, that also acts to corroborate that the defendant was present. What about— We also have the text from Jokori to the defendant saying, Your people are ready, which also suggests that he's a little bit more significant in this than the others. What about the defense's theory at trial that this mysterious Miami person was actually the attendee at the meeting? Again, I would submit to the Court that—I guess this gets to what Judge Smith and Judge Wallace mentioned, which is you're talking about the sufficiency, all inferences and conflicts resolved in favor of the jury's verdict under Neville's. I would submit that this is not a case, for example, like the defendant notes when it comes to the replaying of testimony, that that's rereading testimony. This is a jury listening to an exhibit that was admitted. I mean, we're not — I'm not talking sufficiency. I know the defendant raises the sufficiency challenge. I'm talking about if there was error in admitting the informant's ID of the defendant at that meeting, then it's your burden to show that that error was harmless beyond a reasonable doubt. Yes, and I believe that's shown here. Again, we have the defendant's Cadillac being present at the meeting. We have the phone records. We have the defendant's presence on the day of the arrest, as well as the phone records. He's the one who makes the call to Mako about — and this is after Mako's been arrested at the warehouse. The defendant is the one making the call to him. And, again, he's demonstrating that he's part and parcel of this conspiracy. And I would submit— You're conflating two things, and I just want to step back. But, I mean, that also enhances the ID. Okay. But hold on one second. Sure. Do you — would you agree with this statement? And if you don't, I'd just like to hear why. The jury could not have convicted your — the defendant unless it found that he was a participant at the February 4th meeting. Do you agree with that? No, I don't. Okay. Why? Well, I believe that, number one, there is sufficient evidence, and I do believe this addresses your question. If there's sufficient evidence to show that he's present, independent of the informant's Then there's sufficient evidence to show he's present. And then you have to gather it all together in the scope of everything else. So I don't believe that we can isolate out quite as cleanly as the Court is suggesting. But when it comes to the overall conspiracy, we have evidence the defendant participated in it, and we have evidence that he was present, independent of the ID. Okay. But if — let's say that there were — there was doubt, there was reasonable doubt as to whether the jury could have found him present at the February 4th meeting. Yes. Is there any other evidence that would suggest, even though he was involved in a potential home invasion scheme, that he knew that it involved cocaine or narcotics at all? Well, knowledge in that context can be proven by circumstantial evidence. So, yes, I do believe so. Because based on all the interactions, the coordinated activity, and all the things that we noted in our brief, it would just be a little too coincidental. The jury could find, then, that he was part of this conspiracy. And I would agree with Judge Wallace that there was sufficient evidence to convict the other two. But a jury, of course, can — Home invasion robberies can be for all sorts of loot, not just drugs. So that's what I guess. I mean, my theory as to — if we want an explanation for why those other two people got convicted, because they weren't at the February 4th meeting and there was no other evidence from which the jury could infer that the defendant knew that drugs were the target of the home invasion robbery. That's why I think those other two got acquitted. Well, the informant's testimony also, Your Honor, I mean, just the overall testimony about what happened at that meeting and about what the role was and the purpose was, the jury had that. And so that's also part of the sufficiency. Not just his idea of the defendant at the meeting, but the overall discussion of what occurred at that meeting, as well as, then, what happened afterwards that showed that everybody was acting in a coordinated manner. I think all of that plays into not only the harmlessness analysis with the ID, but also the sufficiency analysis with the conspiracy. How much detail, how much specificity is the defense required to present in its objections, if any, to the court about why the identification procedure was unduly suggestive? It seemed very cursory. What does the case law require in terms of how much specificity is required? Your Honor, I don't think I know the answer to that specifically off the top of my head. I do know that an objection needs to be made. But as far as the layers of it, I'd have to look back at the cases. I'm sorry. But in terms of the ID, again, you have the sufficient reliability, because I'd like to go back to that. You know, even this Court's case law where somebody was present for a minute was sufficiently reliable for somebody to basically cross over into the Bigger's test of reliability. Here we have 12 minutes he's present with this defendant. And we have 3 to 4 or 3 to 4 feet away. So these are, you know, again, considering the Court has found reliability where somebody's seen somebody for a minute or less, this seems to just cross that threshold. But what gives you confidence that the ID is reliable, notwithstanding the suggestiveness of the show-up procedure, is that the person can give a description that actually matches the person who's ultimately ID'd. Well, you know, there's a part where the defendant talks about the hair in the back, and the defendant mentioned that he had a nylon hat on as well as a hat. And so the defense, and he said he could see, I guess, the hair in the back. But the defense, I think, in cross-examination, didn't quite get exactly right how the informant had previously identified. So again, I would say that these are conflicts the jury resolved in favor of the ID. I guess just to pinpoint more precisely, I'm thinking of the facial hair and the build of the defendant. The informant gets the build, as I understand it, completely wrong. But you tell me if I'm mistaken in that. You know, I don't recall that, Your Honor, but I'd have to, I guess I'd have to look back. It says that the person who was at the meeting was, I think, tall and slender. And, I mean, I don't know if you were at the trial. I take it the defendant is not slender. Well, based on the pictures that are in the Court, the Court has the picture of the defendant after he was arrested. I mean, I don't think he looks like a football player. I mean, I think that the jury, again, could make the rational calculation about the informant's ID. Also, when they recognize the defendant's caddy is present. That also adds that a little bit more cementing of the accuracy of the informant's identification. Because it's not just, I see him in yaw. The vehicle was present. He identified more than just this defendant. Yes, he did. He accurately identified the other Mexican co-conspirator that was present there. And they played guilty. Two of them. And they played guilty. I don't remember, Your Honor. All of them. Okay. But the bottom line is, I think, again, there was sufficient reliability for the identification to be admitted. There's also sufficient identification.  analysis. Yes. It questions whether he identified this defendant. But he identified the others in the group correctly. Yes, he did. You're right. I forgot to mention that. Because they played guilty. Right. I forgot to mention that. Thank you. Is jury aware that the other folks played guilty? I don't believe I saw that in the transcript at all, Your Honor. Also, the defendant mentioned something about the translation being inaccurate or something. Again, there was never an allegation. This was disclosed in November 2011. The trial was in August. I can ask you about his Elaine error argument. Yes. I'd like to hear your response to that. Yeah. Because it seems to me that the way that verdict form question was worded was not . . . it wasn't right. But I'd like to hear if you think it's defensible. It didn't require the jury to find that this defendant either could reasonably foresee that 65 kilos of cocaine would be involved or that that was a part of the conspiracy that he signed up for. Well, the defendant did make an Elaine objection below. So I think the question would be harmlessness if you did think the instruction was not appropriate. But I would submit that it was sufficient to make that finding because how much cocaine was involved with the conspiracy, they're finding him guilty, and then they also find that 65 kilos was the weight of cocaine. And I believe the evidence would support that, even if this Court were to find it wasn't precise under Elaine. I think it was sufficient. But the standard is, did the evidence sufficiently so? And this is based on the defendant's Banuelos case. Banuelos is a separate question. We have a jury finding beyond a reasonable doubt that 65 kilos was involved. In Banuelos, the Court made a weight finding that triggered a minimum, mandatory and maximum that was higher, and by clear and convincing evidence. It's a wholly separate question. This was jury making a finding beyond a reasonable doubt. And is that supportable? Sure. Even under Banuelos, the general analysis for guideline purposes would be did it fall within the scope of the defendant's agreement or was reasonably foreseeable? Again, if the jury finds that he knew what was going on, it was reasonably foreseeable, and of course, he was present at the meeting. It was discussed. Breyer. I agree with you if he was present at the February 4th meeting, then it's an easy case. But you, you were prepared to argue, and you did argue just a minute ago, that the jury could have convicted him even if it had doubts about whether he was at the meeting. I'm sorry. Say that again. I'm sorry. If he was at the February 4th meeting, it's an easy case for you, I agree. But you, you argued today that the jury could have convicted him of the same charges even if he had not been present at the meeting, right? So if he, and we don't know because the jury wasn't asked to tell us whether they found that he was at the meeting or not. So if he, let's just go on the assumption that he was not at the meeting. The jury couldn't conclusively determine that. They nonetheless convicted him. What evidence was there to show that the defendant knew that 65 kilograms of cocaine would be involved in this home invasion robbery that he signed up for? Basically, Your Honor, again, I would disagree with the presumption that you're making that we have to absolutely carve out that the defendant wasn't present on February 4th. The evidence shows he was. It was corroborated. That evidence would allow the jury to make that finding. If not, you're back to the circumstantial evidence demonstrating that they all had agreed to do what the informant said the conspiracy was all about. Remember, we've got surveillance, we've got undercover recordings that corroborate the essence of what the conspiracy was. We have the defendant on the day of the arrest making phone calls to Mako when he was arrested. I mean, it's showing this knowledge about what it is that the conspiracy was about, and I would submit to you that that would support it. But I don't think you should carve out a fact that the defendant was present because evidence was sufficient to show that, and the identification was also sufficiently reliable. When it comes to the sufficiency as well, I just wanted to make sure I hit some of the other things. Oh, also the severance. I know this hasn't come up today, but I just wanted to make a point that I realized I didn't make in the brief. The defendant argues that the statement that Ranger said one of his passengers had a Glock pistol, number one, doesn't directly implicate the defendant. I wanted to make that point. But also second, we have the Glock is found in the rear pocket of the driver's seat, and the defendant was the right front passenger, and there were two other passengers in the back. And you can see the location of the weapon on SCR 128 to 129. 128 is the picture. So I would submit to you that that further undercuts any suggestion that Ranger's comment implicated the defendant, both specifically or inferentially. Unless the court has any more – oh, I forgot to mention we never got back to the replaying issue. So we have, as I mentioned in my 28J letter, that at CR 908, we have a minute entry. And the minute entry says the jury is brought into the courtroom by the clerk to view Exhibit 2C, which is on a CD. And I brought that, but again, that's the Spanish language. I don't know that will help you all that much. But the reason it says here that Nicole Williams, automated litigation support specialist who plays the CD, because she was the one who played it in trial, that's the program that allows you to see the Spanish and then see the English words as well. It's unclear whether or not the jury also happened to look at the transcript of 2C at the same time, but the judge specifically said that the transcripts were not going back to the jury room. So, again, I submit that this is different than what the defendant seeks to paint it. And I mentioned Felix Rodriguez in the 28J letter. And in that case, you know, the defendant does make an argument here that the defendant wasn't present during the playback. In Felix Rodriguez, that was found to be harmless. What we have here is similar in some context to Felix when it comes to harmlessness, because, you know, the district court said to the parties, hey, this is what's going to happen if they want to replay this. We're going to have Moe. And there was no objection. And there was no objection. We're going to have Moe bring him in. We're going to have Nicole play the tape. We're not going to have any talking, and nobody's going to talk to them. So I think the court did take steps to make sure that the jury was not influenced by outside matters, and that's very similar to what happened in Felix Rodriguez. Also, when it comes to the actual replay of the tape, again, the defendant's cases rely on replaying of testimony. I submit to you that that's different, rereading testimony, than this. The court did very similar things, said nobody's going to talk. The defendant was present when the court originally admitted the tape. And, again, I'm looking at Felix Rodriguez, pages 967 to 968. The court also said what you hear is evidence very similar to, and that's at ER 104, very similar to what happened in Felix, and the transcripts were ordered not to go back. That's at ER 113. So, again, that seems similar. And Newhoff, the defendant, again, relies on that, that's rereading testimony. And even in Newhoff, there was no violation of substantial rights found under Olano, and this is plain error, this case. So I would submit to you that that is not an issue that would warrant reverse at all. And I would ask you to affirm the conviction and sentence. There's sufficient evidence to support it, and any error did not affect the verdict in this case. Thank you. All right. Any other questions? No. Thank you very much. Thank you. Now, you're on. Can I take it the front door is still here and still working? Well, I'm not quite sure where to start, Your Honors. I disagree very strongly that there's sufficient evidence to convict appellant aside from that February 4th meeting. I just don't think it's there. And the evidence of that is you look at the individuals who were convicted. Basically, everybody who spoke Spanish, who interacted directly with the informant, personally as well as telephonically, the people that attended the February 4th meeting and attended other meetings as well, and the people that went to the warehouse, which is where the informant was trying to get them to go, those were the people that were convicted. The two vehicles that were stopped… They were convicted or pled guilty. Or pled guilty. I mean, they were convicted one way or the other. They entered pleas. They had them. Right. So the government got their convictions in those instances. But not your client because he went to trial. Well, yes. But my point is that there's a very dramatic distinction between my client's alleged role in this and nearly all of the other defendants that I can think of who either pled guilty. I don't think there was another trial except for this particular trial. The point is the informant… You asked a question, Your Honor, about the informant having identified other suspects. But the reason he could identify those other suspects is that he had a substantial amount of interaction with them. As I read the cases, there was a lot of interaction here. Four minutes. Nothing to indicate there's any interference with his ability to see. He was standing within… No, it was 12 minutes. And he was standing within three or four feet of the person. The cases that we get are much less than that. Why would we feel that the jury couldn't make a determination that the identification took place under those circumstances? That is, why would we interfere with the jury finding on that basis? I understand the bigger part, but if you get past the bigger part, the evidence went to the jury. Right. Well, to address the factual context that Your Honor has just brought up, we all have now been in this courtroom for 42 or 43 minutes. So that gives you some idea of what a 10 or 12 minute time span consists of. Now ask yourself whether you'd be able to identify everybody in this courtroom, those people who maybe you have offhandedly observed for 10 or 12 minutes. I don't think that's a fair analogy at all. This person was a government agent going in and making identification. It was his business. It's what he did. He was identifying people, and it's what he has in the background. He has 12 minutes, three or four feet. And what you're arguing is that that's insufficient evidence for the jury to make a finding. So it doesn't matter what I would do. It's a question whether the jury had enough evidence to sustain that finding. Well, there's two issues. There's the bigger issues, but with respect to the sufficiency of the evidence, I would point out that the informant, when he was first asked about this, in a pretrial hearing that predated the trial by more than a year, there was testimony that the informant was shown a photograph of my client, who was among two black individuals, in the photo array,  words to the effect that he was not certain. And I think he was asked by defense counsel on cross-examination, or the case agent was asked, then he wasn't sure at that time, and the case agent said words to the effect of, I don't think so. But don't we get back to the point that Judge Wallace made earlier, which is this is really the jury's problem. Your colleague at the trial, if I recall, spent roughly ten minutes cross-examining the government informant, raised each and every issue that you talked about and more to try to break his story, to try to convince the jury that there's no way that he could have possibly identified him. In our system, when he's done that, the jury has the province to make the decision, and they apparently believe the informant. As long as there's not something else as a matter of law that bars his testimony, aren't we to rely upon the jury in this situation? Well, let me just say that the other evidentiary problems, I think, play into this. The fact that the jury was able to focus so exclusively on a relatively brief recording of that meeting and a brief transcript of that meeting, and to take the informant's testimony, which was changed over time and became stronger as— But that isn't all they had. They had this pattern of telephone calls, even the phone calls to the driver. There were, what, 15 of them right around there. There was the phone calls that fit into the overall program. He said he wasn't there, but his Cadillac was parked out front. The jury heard all those, and they had to make a determination of where the truth is. It's pretty hard to say, even though it may be thin as you view it, I just wonder how we can say that we'd have to set aside a jury verdict under those circumstances. I might have tried the case differently if I were the judge making the decision, but that's not the issue. Any other questions from my colleagues? If not, we thank you very much for your presentation. Thank you very much. The case just argued is submitted.
judges: Wallace, Smith, Watford